FIRTH STERLING, INC. *v.* UNITED STATES (No. 5055)[1]

United States Court of Customs and Patent Appeals, July 14, 1961

*Eugene R. Pickrell* (*Richard F. Weeks*, of counsel) for appellant.

*George Cochran Doub*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Murray Sklaroff*, trial attorney, of counsel) for the United States.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[2]

RICH, Judge, delivered the opinion of the court:

This appeal is from a judgment of the United States Customs Court, Second Division (C.D. 2176), overruling appellant's protest to the classification of imported merchandise invoiced as "Artificial Tungsten Scheelite Concentrates." The invoice states that these concentrates contain 75.25% $WO_3$, which is tungsten trioxide. This would appear to be a statement of the $WO_3$ equivalent of the calcium tungstate content, of which the imported concentrates were principally composed.

The collector classified the merchandise as a compound of tungsten under paragraph 302(g) of the Tariff Act of 1930, as modified by GATT, T.D. 51802. The importer claims that the proper classification is as a tungsten concentrate under paragraph 302(c), Tariff Act of 1930. These statutory provisions are:

Paragraph 302(c):

Tungsten ore or concentrates, 50 cents per pound on the metallic tungsten contained therein.

---

[1] C.A.D. 779.

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell* pursuant to provisions of Section 294(d), Title 28, United States Code.

Paragraph 302(g), as modified:

Tungstic acid, and all other compounds of tungsten, not specially provided
for_____ 42¢ per lb. on the tungsten
contained therein and 20% ad val.

The facts are not in dispute. The sole issue is one of law and is
whether, considering the processes by which the imported merchan-
dise was made, it is entitled to be considered a "concentrate." It
seems to have been assumed throughout the case that if it is a "con-
centrate," then the protest should be sustained as paragraph 302(c)
would then be a specific provision for the material which would take
it out of 302(g). In the ensuing discussion it will be useful to know
that another name for tungsten is wolfram, that its chemical symbol is
W, and that scheelite is a tungsten compound which, in the pure form,
is calcium tungstate ($CaWO_4$).

The stipulation, which provides almost the entire factual back-
ground of the case, reads as follows:

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys
for the respective parties hereto that the merchandise the subject of the above
protest was produced by the following method of production: Crude low grade
scheelite ore containing calcium tungstate equivalent to 2 to 10% $WO_3$ is ground
in a ball mill to a fineness of 100 mesh per square inch. The ground ore is then
concentrated by the use of a magnetic separator and by flotation in oils to remove
iron and other impurities. It is then roasted in a rotary furnace to remove sul-
fur and arsenic. At other times, depending upon market conditions, low grade
scheelite tungsten concentrates containing calcium tungstate equivalent to ap-
proximately 20% $WO_3$ are used instead of the roasted concentrate. Either the
crude low grade scheelite ore, ground and concentrated by magnetic separator
and by flotation in oils and roasted, as previously described, or the secondary
scheelite tungsten concentrates are then mixed with soda and the mixture is
then calcined in a rotary furnace. The calcined product is then leached with
water to obtain sodium wolframite liquor. Lime is then added to the liquor caus-
ing calcium tungstate to precipitate out. The calcium tungstate is then separated
and dried to remove the water. Most of the impurities not previously removed
by magnetic separation, flotation in oils and roasting, or in the preparation of
the low grade concentrates, are in the residue from the leaching process in
obtaining sodium wolframite liquor. The calcium tungstate, together with
any impurities not removed in the leaching process, is the imported artificial
scheelite tungsten concentrates.

In this stipulation the parties appear to be in agreement, according to
the last word of the stipulation, that the imports are "concentrates" in
some sense or other, but they are completely at odds as to whether they
are "concentrates" within the meaning of the tariff act provision for
"Tungsten * * * concentrates." The sole question is whether by com-
mon meaning the material produced by the processes set forth in the
stipulation is tungsten concentrates.

Appellant introduced certain exhibits, asked the court to take
judicial notice of certain other matters, and adduced the testimony of
four witnesses for the purpose of showing that the merchandise is, by

common meaning, a tungsten concentrate. The Customs Court seems to have been greatly impressed by the plaintiff's case, particularly, to quote from the opinion below, "exhibit 3, a letter from the Bureau of Customs of the United States Treasury Department, wherein reference is made to a statement by the Bureau of Mines of the United States Department of Interior 'that synthetic scheelite statistics are included in the tungsten concentrate class.'" (The evidence shows that "synthetic" scheelite is another name for "artificial" scheelite. The witness Huemme said the former was the term usually used.) This Exhibit 3 is a ruling by the Bureau of Customs *that artificial tungsten scheelite concentrates, which is what the merchandise at bar is, are properly classifiable under paragraph 302(c) as tungsten concentrates*, which ruling is predicated on documentary information shown to have been provided to Congress before that body, in the Tariff Act of 1922, for the first time inserted a provision for "tungsten ore or concentrates." The Bureau of Customs said, in Exhibit 3, dated June 3, 1955:

> The evidence of record shows it was within the knowledge of the Congress at the time of the passage of the Tariff Act of 1922 that certain *chemical processing* of tungsten concentrates produced by *mechanical* means was known as "concentration." It appears, therefore, that the Congress in the 1922 act in providing for "tungsten ore or concentrates" actually intended to include not only *mechanical* concentrates of tungsten ores but also concentrates produced by *chemical* means. [Emphasis ours.]

This passage brings us to the very center of the controversy here.

It is the position of the Government, and the lower court adopted it with seeming reluctance, that this court in *United States* v. *C. J. Tower & Sons*, 43 CCPA 49, C.A.D. 608, judicially defined "concentrate" so as to exclude concentrates produced chemically. Ancillary contentions are that "chemical concentration" is a misnomer and that the term "concentrate" by common meaning refers only to "physical" processing.

Appellant argues that common meaning of "concentrate" when determined by more complete authorities than those considered by the court in the *Tower* case includes chemical concentration, that the *Tower* case is distinguishable in that it dealt with different statutory provisions and different materials differently made, and that Congress intended to include artificial or synthetic scheelite concentrates in the "Tungsten ore or concentrates" provision of paragraph 302(c) notwithstanding the fact that they result from a process of production from the original ore in which "chemical" as well as "mechanical" processes are involved.

While it seems somewhat arbitrary and unrealistic to assume the technical validity of the clearcut, mutually exclusive dichotomy of "mechanical" or "physical" versus "chemical" process steps in which

the discussion has been cast, we will assume its validity, arguendo, as the parties seem to do and discuss the issue in those terms.

Inspection of the stipulation quoted above will show that the synthetic calcium tungstate concentrates are derived from scheelite ore by one of two routes, not too adequately set forth in the stipulation. The first route involves starting with low grade scheelite ore, grinding it, subjecting it to magnetic and flotation separation, and roasting it. The process to this point appears to be assumed to be "mechanical" though driving off sulfur and arsenic with heat would seem to partake more of the nature of chemical processing. The resulting product at this point appears to be admittedly a "concentrate," the grade, or calcium tungstate content, or $WO_3$ equivalent content, of which is not disclosed except that by implication it is not as high as the market demands. The second route starts with "low grade scheelite tungsten concentrates containing calcium tungstate equivalent to approximately 20% $WO_3$" and we are not told how they are made or where they come from. Exhibit 3, however, refers to a 1919 Tariff Commission Report prepared for the House Ways and Means Committee, entitled "Information Concerning Tungsten-Bearing Ores," in which it is said that the mills making tungsten concentrates were wont to produce two grades, "a high grade sand concentrate, containing approximately 60 percent $WO_3$ and suitable for making ferro-tungsten in the electric furnace; and a slime concentrate of lower grade, containing about 20 percent $WO_3$, and suitable only for a chemical process." The low grade 20% concentrate of the stipulation may well be such as the latter, but we have no proof of it. The term "slime" would indicate that the product came from a process of wet "mechanical" concentration.[3] The Government tacitly admits this 20% product is a "concentrate."

In any case, the rest of the stipulated process of production is what the parties and the court below regard as a "chemical" process. Clearly it is since two chemical reactions take place in it (which appellant's expert witness Linz referred to as one), namely, the reaction of soda with calcium tungstate and the reaction of sodium tungstate liquor with lime to produce the "synthetic" calcium tungstate concentrate by precipitation from solution. Therefore, the total process is regarded as one comprising chemical changes which bar the product from classification as a "concentrate" because of this court's decision in the *Tower* case. After reviewing the appellant's evidence, the Customs Court said:

If this were a case of first impression, the foregoing references indicative of congressional intent [to include tungsten concentrates produced chemically as

---

[3] *"Slime* is the term used in milling practice to describe a suspension, in water, of the finely divided fraction of pulverized ore; also the solid, whether suspended or after settling and/or drying." Taggart, *Handbook of Mineral Dressing,* 15-04 (1945).

herein among paragraph 302(c) concentrates] would be persuasive. However, our appellate court, in the *Tower* case, *supra*, has stated with emphasis that "a concentrate must be the result of physical changes only."

As we view this case, there are two questions determinative of the issue: Was our decision in the *Tower* case as categorical with respect to the common meaning of "concentrates" as the lower court assumed, and if not, has appellant established that the common meaning of the language in paragraph 302(c), "Tungsten ore or concentrates," comprehends the imported merchandise?

### The Tower Case

### (43 CCPA 49; C.A.D. 608)

The imported merchandise was "stabilized zirconium oxide" made in the Canadian plant of The Norton Company by a process described in U.S. Patent No. 2,535,526. The opinion has this to say about it:

The process of patent No. 2,535,526 comprises fusing in an electric arc furnace a mixture of zirconium ore, carbon, iron borings and lime. As the result of this procedure the oxides of silicon and zirconium in the ore are separated from each other, the silicon oxide (silica) is reduced by the carbon to produce free silicon and this silicon combines with the iron to form a ferro-silicon which sinks to the bottom of the furnace and is readily separated from the other materials. The inclusion of the lime, which is referred to as a stabilizing agent, results in the production of a zirconium oxide (zirconia) which, instead of the natural monoclinic crystal structure has a crystal structure varying from 50% monoclinic and 50% cubic to 100% cubic, depending on the amount of lime used. The patent alleges that the so-called stabilized zirconia, having the cubic crystal structure is superior to that having a monoclinic structure.

Some of the imports were made with, and some without, lime.

The collector classified the imports as "Earthy or mineral substances wholly or partly manufactured" under paragraph 214 of the 1930 Act and the importer claimed they should be free of duty as "zirconium ore concentrates" under paragraph 1719 which provided for certain stated materials which could also qualify as "Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for: * * *."

The Customs Court had held that the material made without lime, with the result that the end product contained more of the same kind of zirconium oxide than the starting material or ore, was a "concentrate" and duty-free. The material made with lime, whereby the crystal structure of the zirconium oxide, as well as its concentration in the final product, was changed, was held not to be a "concentrate" but to be "mineral substances wholly or partly manufactured" and therefore dutiable under paragraph 214. This court reversed the former holding and affirmed the latter, its decision being that none of the imports were zirconium concentrates.

On the basis of certain definitions before it, limited in number and scope, not purporting to be exhaustive of available definitions, and obviously omitting pertinent definitions of equally authoritative available sources, the opinion made the statement:

*From those definitions* [three cited] it is clear that a concentrate must be the result of physical changes only. [Emphasis ours.]

The opinion then discussed an extract from a Taggart's Handbook of Mineral Dressing taken from a court opinion of a state court in the State of Washington, which does not identify the edition of Taggart referred to, and said:

It will be seen that the quoted statements are in complete accord with *Webster's definitions,* to the effect that a concentrate *must* be the product of a process which involves no substantial chemical change. [Emphasis ours.]

The Webster definitions referred to were:

Concentrate n. (a) The product of dressing ore, consisting of finely ground minerals and containing the valuable ore.

Ore dressing. Treatment of ore involving physical, *not chemical,* change, as crushing, concentrating, sampling, etc. [Emphasis ours.]

Not cited, however, were broader definitions to be found in the 1913 edition of Funk & Wagnalls New Standard Dictionary:

Concentrate. * * * 2. *Chem.* To intensify in strength or to purify by the removal, as in evaporation, of valueless or unneeded constituents; condense; intensify. 3. *Mining.* To separate (ore or metal) from its containing rock or earth. Concentrate, n. A product of a process of concentration, as in chemistry or metallurgy.

Concentration, n. * * * *Mining.* The removal of the less valuable parts of ore preparatory to smelting.

Neither are these intended to be exhaustive but they are sufficient to illustrate the risks inherent in reasoning from the brief definitions in one dictionary to determine common meaning. We think, in any case, that ▮ too great reliance should not be placed on a *general* dictionary to determine the common meaning of technical terms. In the field here involved "concentrate" is obviously a highly technical term and no general dictionary can be expected to reflect all of the refinements of its meanings in different contexts.

Appellant has called to our attention the following significant statement from Taggart's "Elements of Ore Dressing" (1951):

Ore dressing, as presently defined and practiced, is the art of primary treatment of solid-mineral crudes to enhance their net value. *Fifty years ago* the crudes treated were almost exclusively metalliferous, and *value enhancement was confined to physical concentration. Today* the nonmetallic crudes treated exceed the metalliferous in yearly tonnage, particle-size change and control vie with concentration in importance, and *chemical as well as physical treatments are regular practices.* [Emphasis ours.]

While this does not show what the situation was in 1930, it does show that in the 1901–1951 interval chemical concentration came into increasing use.

Appellant also quotes from "A Review of the Tungsten Industry," prepared by the Tariff Commission in 1918 and cited in Exhibit 3:

> *Chemical concentration* is rarely resorted to on account of its prohibitive cost. *This is sometimes done*, however, by decomposing the crude silicious ore with soda ash and the sodium tungstate removed by leaching. [Emphasis ours.]

That is part of the very process involved here, recognized as "concentration" though it is a "chemical" process.

Finally, with respect to the *Tower* case, we note that it dealt with different statutes and different materials.

We do not feel bound by the supposed definition of "concentrate" in the *Tower* case for the above stated reasons and for the further reason that, as we have previously stated, *Marshall Field & Co.* v. *United States*, 45 CCPA 72, C.A.D. 676, ██ we do not take it to be the function of the court to "define" technological terms in the tariff act but rather to construe and apply them on a case by case basis. We are often, as here, required to determine common meaning of technical terms in part on the basis of evidence supplied to us and the evidence in one case might lead to a different meaning than the evidence in another case. Equally important is the fact that the same term may mean different things in different contexts and we cannot undertake to "define" it for all purposes. Tungsten "concentrate" may very well be produced by different processes than zirconium, or iron, or copper, or phosphate "concentrates." This is a very different thing from ruling on what words like "and" or "such" or "similar" mean in a statute. Perhaps we do "define" words like these, which are lawyers' tools, but we do not attempt to "define" the words which are the tools of the chemist, the physicist, or the metallurgist in the sense of giving them a meaning which they will have in all contexts and under all circumstances.[4]

---

[4] The impossibility of defining "concentrates," specifically, in one case so as to fix its meaning in other cases is manifest from this item in *A Glossary of the Mining and Mineral Industry,* a publication of the Bureau of Mines, Department of the Interior (1920):

> CONCENTRATE. 1. To increase the strength by diminishing the bulk as of a liquid or an ore; to intensify or purify by getting rid of useless material (Webster). To separate metal or ore from the gangue or associated rock. (Murray's Dict.) 2. That which has been reduced to a state of purity or concentration by the removal of foreign, nonessential, or diluting matter (Century). A product of a process of concentration, as in chemistry or metallurgy (Standard). The product of concentration (in mining). Used in plural form as "arrangements for treating the *concentrates* were complete" (Murray). Concentrates are called "ore" at Joplin, Mo.; "mineral" at Michigan copper mines, and "tailings" at Black Hawk, Colorado.

In removing the *Tower* case as a controlling precedent we have removed the basis on which the court below decided what the common meaning of "concentrate" must be. It felt, apart from our prior opinion, that plaintiff "with much show of reason" had presented "persuasive" evidence that synthetic scheelite concentrates should be classified as tungsten concentrates.

In addition to Exhibit 3, the Bureau of Customs ruling that the instant merchandise was classifiable in paragraph 302(c), a ruling which is supported by evidence of its own, appellant produced an expert witness, Arthur Linz, a technical consultant in mineral beneficiation with a B.S. in 1917 and an M.S. in 1928, who had actual experience in concentrating tungsten. He had studied the process outlined in the stipulation and had seen it operating in the plant where the imported merchandise was made and elsewhere. He had operated plants where the process was employed. He said:

Q. Are you able to give us an opinion with reasonable certainty as to whether or not that synthetic scheelite is a concentrate? Are you able to give us that opinion? A. It's considered so by everyone in the trade and I consider it so myself.

Examined by the court, this witness also said:

Judge Lawrence: And you start with tungsten ore to produce natural scheelite?
The Witness: Yes, sir.
Judge Lawrence: Do you start with tungsten ore to produce artificial scheelite?
The Witness: Yes, sir.
Judge Lawrence: And when you have finished your process of the production of scheelite either natural or synthetic have you the same chemical structure in both?
The Witness: They are identical in every respect, sir.
Judge Lawrence: And are their uses identical?
The Witness: Identical, sir.

    \*      \*      \*      \*      \*      \*      \*

Judge Lawrence: Would you define in a few words for the benefit of the court a concentrate as you understand the term?
The Witness: A concentrate is the end product as it's used by the metallurgical industry, in other words, the product that the consumers use.
Judge Lawrence: So that whether you produce natural scheelite or this artificial scheelite your result is a tungsten concentrate?
The Witness: A tungsten concentrate as required by the consuming trade for the metallurgical industry.
Judge Lawrence: And do both of these concentrates go to the same trade for ultimate use?
The Witness: Yes, sir.
Judge Lawrence: And is one preferable to the other?
The Witness: Not to any great degree, provided they are both analytically the same.

Judge Lawrence: And the price?

The Witness: The price is usually the same.

It might be well to point out that we understand the "natural" scheelite concentrate to be a product made without resort to the "chemical" processing relied on by the Government and admitted to be a "concentrate" within the statute, at least by inference, and to be such a material as the "high grade sand concentrate" containing 60% WO$_3$, referred to in the Tariff Commission Report cited above.

Another witness, Marth, a former appellant employee, retired, metallurgist, experienced in tungsten ore processing, said he would call the product of the process described in the stipulation a tungsten concentrate.

The Government took no testimony.

We are satisfied from the entire record that by common meaning the imported synthetic or artificial scheelite concentrate, the value of which resided in its calcium tungstate content, is a "Tungsten * * * concentrate" as provided for in paragraph 302(c).

The judgment of the Customs Court is *reversed*.

WORLEY, C. J., concurs in result.

MARTIN, Judge, concurring.

Even though the merchandise at bar [5] is a synthetic compound of tungsten, I believe that it should be classified under paragraph 302(c) rather than 302(g). I arrive at this conclusion because of the common meaning of certain significant words and because of the distinction between the subject compound and those intended to be covered by 302(g). In this instance, the common meaning of these words can readily be ascertained from lexicons.

"Concentrate" has been defined as follows:

Webster's "New International Dictionary," 1924:

Concentrate, *n.* That which has been concentrated. See concentrate, v.t. 2.

Concentrate. * * * v.t. * * * 2. To increase the strength by diminishing the bulk of, as of a liquid or an ore; to intensify or purify by getting rid of useless material; to condense; as to *concentrate* acid by evaporation; to *concentrate* ores by washing * * *.

Hackh's "Chemical Dictionary," 1929:

Concentrate. (1) In chemistry: To increase the strength by diminishing the bulk of unwanted material. * * *

According to the record here, the whole process as outlined in the stipulation was used *only* to increase the content or "strength" of the ore by "diminishing the bulk of unwanted material." The low

---

[5] Although the imported merchandise was designated in the consular invoice as "Artificial Tungsten Scheelite Concentrates," it appears from the testimony that the name "synthetic scheelite" is more commonly used in buying and selling this merchandise.

grade scheelite [6] ore containing calcium tungstate equivalent to 2 to 10% $WO_3$ and the low grade tungstate concentrates equivalent to approximately 20% $WO_3$ were treated both chemically and mechanically to secure a greater percentage of tungsten by removing the unwanted materials. After processing, the tungsten content, expressed as $WO_3$, was 75.25%, and the material containing this percentage of tungsten oxide was imported.[7] To my mind, according to the dictionary meaning of "concentrate," this merchandise is a concentrate of tungsten secured by processing the low grade starting materials, and it comes within the purview of paragraph 302(c).

Although the process was both chemical and mechanical and the calcium in the finished product was a different calcium than in the preprocessed material, the merchandise did contain a much higher percentage of tungsten and this was the only purpose of the processing. The mere fact that the processed imported material contains different calcium than the starting material does not in this instance require that the importations be classified under paragraph 302(g). The entire process of transforming calcium tungstate into sodium tungstate so that the tungstate becomes soluble in water and thus easily separable from the water-insoluble unwanted materials, and then changing sodium tungstate back to insoluble calcium tungstate in order to produce a solid easily separable from the water was done *only* to increase the percentage of *tungsten* and not to make a compound *per se*. I believe "compounds" in paragraph 302(g) refers to compounds of tungsten which are made purposely as compounds of tungsten or mined in this form, and imported as such to be used for some purpose as compounds rather than as a source of tungsten metal.

Furthermore, tungsten is not found in nature as a free metal.[8] This fact was brought to the attention of the Committee on Finance of the United States Senate prior to the passage of both the Tariff Act of 1922 and the Tariff Act of 1930.[9] The tungsten in tungsten ores is always present in the form of various tungsten compounds such as calcium

---

[6] Hackh's "Chemical Dictionary," 1929: "scheelite * * * A native calcium tungstate, $CaWO_4$."

Webster's "New International Dictionary," 1924: "scheelite * * * native calcium tungstate, $CaWO_4$, a tetragonal mineral, white when pure, and also yellow, brownish, etc., occurring in octahedral, tabular, and massive forms. It usually contains some molybdenum. * * * It is a source of tungsten and tungsten compounds."

[7] A report of the U.S. Customs Laboratory dated October 7, 1953 and part of the entry papers in this case states in part: "The dried commercially prepared sample contains no lead or zinc and 74.70% tungstic oxide. The tungstic oxide is equivalent to 59.24% tungsten and 92.76% calcium tungstate." These figures are cited here to show that the imported material is not pure calcium tungstate. According to information in the entry papers, the difference between 74.70% and 75.25% tungstic oxide, $WO_3$, is not significant.

[8] See Mellor, "A Comprehensive Treatise on Inorganic and Theoretical Chemistry," Vol. 11, p. 675 (1931) wherein it is stated: "Tungsten does not occur in the elemental form in nature." See also Li et al., "Tungsten," p. 4 (1955).

[9] Hearings before the Senate Finance Committee on H.R. 7456, 67th Cong., 2d Sess., Vol. 3 at 1705 (1922); Hearings before the Senate Finance Committee on H.R. 2667, 71st Cong., 1st Sess., Vol. 3 at 233 (1929).

tungstate, $CaWO_4$.[10] Certainly paragraph 302(g) was not intended to include such ore compounds of tungsten. Otherwise, paragraph 302(c) would be superfluous. Consequently, Congress must have considered these ore compounds or compounds made from them and intended as sources of tungsten metal to be something different than the "compounds" covered by paragraph 302(g).

---

[10] See Li et al., *op. cit. supra* note 4, at 113, where it is stated: "Each type of tungsten deposit is a problem by itself in the matter of selection of the proper method of concentration, depending on the tungsten mineral, its allied valuable minerals, and its gangue constituents."

